GULF, COLORADO & SANTA FE RAILWAY COMPANY V. STATE OF TEXAS.

Decided March 7, 1903.

**1.—Carriers of Freight—Interstate Commerce—Stoppage in Transit.**

Where a shipment of grain is interstate in its character, a stoppage in transit, for the purpose of cleaning and preparing the grain for further transportation, will not change the character of the shipment, nor will such effect result from a change of ownership at the place of stoppage.

**2.—Same—Intrastate or Local Shipment.**

Grain was shipped, freight prepaid, from a point in South Dakota to Texarkana, Texas, with a privilege of stoppage and transfer at Kansas City, which privilege was there exercised. The grain was sold to the H. Co. at Kansas City, but was to be delivered to them at Texarkana, and they sold to a grain commission company, agreeing to deliver at Texarkana, and the grain commission company sold to the ultimate consignees at Goldthwaite, Texas, delivery to be made there. The H. Co. received pay for the grain at Texarkana, and five days after its arrival there, their local agent there, under previous instructions from the grain company, transshipped the grain in the same cars, under a new bill of lading, to the purchaser at Goldthwaite. Held, that the interstate shipment terminated at Texarkana, and the further shipment from there to Goldthwaite was local or intrastate, and subject to the rates prescribed by the Railroad Commission of Texas.

**3.—Same—Railroad Commission—Penalty.**

The railroad companies transporting the grain from Texarkana, Texas, to Goldthwaite did so subject to the rates prescribed by the Texas Railroad Commission, and having charged in excess of these rates on the basis of an interstate shipment from South Dakota to Goldthwaite, were subject to the penalty provided in article 4573, Revised Statutes of Texas.

Appeal from the District Court of Tarrant. Tried below before Hon. Irby Dunklin.

*J. W. Terry* and *Cowan, Burney & Lee,* for appellant.

*C. K. Bell,* Attorney-General, for the State.

CONNER, CHIEF JUSTICE.—This suit was duly instituted by the State of Texas, acting by her Attorney-General, to recover a penalty for an alleged violation of article 4573, Revised Statutes, in that appellant demanded and received a greater sum for freight than allowable under the rate fixed by the Railroad Commission of Texas upon a shipment of corn by the Samuel Hardin Grain Company from Texarkana, Texas, to Goldthwaite, Texas. The trial was before the court without a jury, and resulted in a judgment in favor of the State. The facts as found

32 Civil—1.

by the trial court seem to be practically undisputed; the same not hav-
ing been challenged, save in a single particular, as to which, however,
we think the evidence is sufficient to support the finding, and which
therefore need not be further noticed.   The trial court's conclusions of
fact are as follows:

"(1)   The Railroad Commission of Texas, after due notice of the
time and place where the rates would be fixed by it, fixed and established
the rates which might be charged by a railroad, or by two or more lines
of railroad, whether under the same management and control, or not,
for the transportation of corn between points within the State of Texas,
in car load lots, at 12½ cents per one hundred pounds for a distance
of over 165 miles, which rate became effective on March 10, 1899, and
remained effective until the present time, of which action the defendant
and the Texas & Pacific Railroad Company received legal notice before
the rates prescribed became effective.

"(2)   The distance from Texarkana, Texas, to Goldthwaite, Texas,
over the Texas & Pacific Railway to Fort Worth, and from Fort Worth
over the G. C. & S. F. Ry. to Goldthwaite, Texas, is more than 165
miles.

"(3)   The Texas & Pacific Railway Company owns and operates a
railroad from Texarkana, Texas, to Fort Worth, Texas, and the defend-
ant from Fort Worth, Texas, to Goldthwaite, Texas, and each of these
points and all intermediate points on each of said roads are entirely
within the State of Texas.

"(4)   The Texas & Pacific Railway Company executed a bill of lad-
ing, dated Texarkana, Texas, January 13, 1902, which bill of lading
purported to acknowledge the receipt from the Samuel Hardin Grain
Company, at Texarkana, Texas, of one car of sacked corn, same being
car 3845, P. & G., and which bill of lading purported to show that the
said corn was consigned to shipper's order, notify Saylor & Burnett,
Goldthwaite, Texas.

"(5)   Said car load of corn was transported by the Texas & Pacific
Railway Company to Fort Worth, and there delivered to the defendant,
and was by it received and transported to Goldthwaite, Texas, where it
arrived on the 17th day of January, 1902; and Saylor & Burnett, who
were acting for Samuel Hardin Grain Company, tendered to the de-
fendant's agent at Goldthwaite $82.50 in payment of the freight charges
thereon.   The said agent declined to accept said amount of $82.50 in
payment of said charges, and demanded $165 for the transportation of
said car load of corn from Texarkana, Texas, to Goldthwaite, Texas.

"(6)   The agent of the defendant at Goldthwaite, Texas, charged,
collected, demanded, and received from Samuel Hardin Grain Company
$165 for the transportation of said car load of 66,000 pounds of corn
from Texarkana, Texas, to Goldthwaite, Texas.   In so charging, collect-
ing, demanding, and receiving said $165 the said agent of the defendant
was acting under instructions from the executive officers and attorneys of
the defendant company, who believed and advised that said shipment

was interstate commerce, and his action in so doing was subsequently ratified by the defendant.

"(7) The Samuel Hardin Grain Company made complaint to the Railroad Commission of Texas of the action of the defendant in charging more than 12½ cents per hundred pounds for transporting said corn, whereupon the Railroad Commission investigated such complaint, and ordered this suit to be instituted, in accordance with the provisions of article 4568 of the Revised Statutes of Texas.

"(8) On December 23, 1901, the Samuel Hardin Grain Company, at Kansas City, Mo., offered to sell Saylor & Burnett, at Goldthwaite, Texas, No. 2 mixed corn at 86½ cents per bushel for delivery on railway track at Goldthwaite, and this offer was accepted for two car loads of corn. This offer and acceptance was by telegraphic communication between the parties at their respective places of business. The Hardin Grain Company did not at that time have the corn, but on December 24, 1901, to fill the order, it contracted with the Harroun Commission Company, at Kansas City, for the purchase of two 66,000-pounds cars of No. 2 mixed corn at 75½ cents per bushel, to be delivered at Texarkana, Texas, to the Hardin Grain Company. Previously to this the Harroun Commission Company had contracted for the purchase of two cars of corn to be delivered to it at Texarkana, Texas, and with these two cars it expected to, and did, fill the order of the Hardin Grain Company. These cars had originated at Hudson, S. D. The receiving carrier at Hudson was the Chicago, Milwaukee & St. Paul Railway Company, which issued bills of lading limiting its liability to losses occurring on its road, with a like limitation of liability of all other carriers that should handle the said corn in transit to its destination. By the terms of said bills of lading the corn was consigned to 'Forrester Bros., Texarkana, Texas,' and shipment made in cars of C. M. & St. P. Ry. Co., care of Kansas City Southern Railway at Kansas City, Mo., with the privilege to stop the corn at Kansas City for inspection and transfer. The corn reached Kansas City on December 17, 1901; was there unloaded, sacked, and transferred to the Kansas City Southern Railway Company, which on December 31, 1901, issued bills of lading reciting that the corn was loaded in cars No. 3845, P. G., and No. 4189, P. G.; that same was received of Forrester Bros., and consigned as follows, 'Shipper's order, notify Harroun Commission Company, Texarkana, Texas,' and reciting further that freight, 14 cents per hundred lb., was prepaid; and one of these cars, to wit, car No. 3845, P. G., is the car in controversy in this suit.

"(9) The Harroun Commission Company paid no freight on the corn from Hudson, S. D., to Texarkana, Texas, as it had purchased it to be delivered at Texarkana.

"(10) The freight on the corn from Hudson to Texarkana was as follows, 18 cents per 100 lb. from Hudson to Kansas City, and 14 cents from Kansas City to Texarkana, all of which was paid by the vendors of Harroun Commission Company. The minimum interstate rate from

Hudson, South Dakota, to Goldthwaite, Texas, was 46 cents per 100 lb., which would have been apportioned as follows: 18 cents from Hudson to Kansas City, and 28 cents from Kansas City to Goldthwaite, Texas. The G. C. & S. F. Ry. Co., the T. & P. Ry. Co., and the Kansas City Southern Railway Company, together with other connecting lines from Kansas City, Mo., to Goldthwaite, Texas, had established a joint tariff of 35 cents per 100 lb. on shipments from Kansas City to Goldthwaite via Texarkana, and originating in Kansas City, had agreed on a division of that rate between them, and had filed tariffs establishing such rate with the Interstate Commerce Commission, and by such steps had brought itself within the provisions of the interstate commerce laws.

"(11) The Hardin Grain Company's officers kept themselves informed of interstate commission freight rates and of the State commission rates, and the reason why they contracted for the corn to be delivered to them at Texarkana was because they could fill their contract with Saylor & Burnett at Goldthwaite at about 1½ cents per bushel cheaper than they could if they had bought the corn for delivery to them at Kansas City, and had shipped from Kansas City to Goldthwaite.

"(12) At the time of the purchase contract between the Hardin Grain Company and the Harroun Commission Company, Hardin, the manager of the former company, intended that the corn to be thereby acquired should go to Saylor & Burnett, and should be shipped to Goldthwaite from Texarkana as soon as practicable; and on December 26, 1901, two days after this contract for purchase had been made, Hardin was informed that the corn with which Harroun Commission Company expected to fill his order would be sacked in Kansas City, and be shipped out of Kansas City to Texarkana, but at the time of making the contract he did not know from whence the corn would come.

"(13) On December 31, 1901, the date of shipment from Kansas City to Texarkana, Harroun Commission Company informed the Hardin Grain Company that the corn to fill the latter order had been loaded to start to Texarkana, and requested instruction as to how the corn should be shipped from Texarkana, for the guidance of F. L. Adkins, their agent at that place, who would attend to such reshipping for the Hardin Grain Company, as per former understanding. Thereupon, and in compliance with such request, blank bills of lading were made out by the Hardin Grain Company in Kansas City, and furnished to the Harroun Commission Company, to be forwarded to F. L. Adkins. These bills of lading were to be executed by the Texas & Pacific Railway Company and F. L. Adkins, as agent for the Hardin Grain Company, and were for shipment of the corn to Goldthwaite, Texas, consigned to 'Shipper's order, notify,' etc., giving the numbers and initials of cars, which information had been furnished by the Harroun Commission Company; and on January 14, 1902, the reshipment having been made as per instructions, the bills of lading, duly executed by the

Texas & Pacific Railway Company, were by Harroun delivered to Hardin Grain Company, who thereupon paid the Harroun Commission Company $1779.64, the purchase price previously agreed upon for the corn, and the receipt of said blank bills of lading by the Harroun Commission Company was the first information had by that company of the intended final destination and disposition of the corn.

"(14) Neither Hardin Grain Company nor Harroun Commission Company had any store or warehouse at Texarkana, but, under the agreement between the two companies (Hardin and Harroun), one F. L. Adkins, who was the agent of the Harroun Commission Company, and stationed at Texarkana, reshipped the corn at Texarkana for the Hardin Grain Company. That shipment was to Goldthwaite, Texas, over the Texas & Pacific Railway Company and the G. C. & S. F. Ry. Co., by bill of lading reciting its receipt from Hardin Grain Company, and consigned to 'shipper's order, notify Saylor & Burnett, Goldthwaite, Texas,' and was transferred, under original seals, and without breaking packages, to the Texas & Pacific Railway Company, after having remained at Texarkana five days. The only thing done by F. L. Adkins was to surrender the Kansas City Southern bill of lading, have the cars set over on the T. & P. Ry., and take a bill of lading from the latter company. The corn reached Texarkana January 7, 1902, and was shipped out from Texarkana January 13, 1902. The defendant was not a party to the bill of lading executed at Texarkana.

"(15) On December 31, 1901, Hardin Grain Company mailed to Saylor & Burnett an invoice of the corn, in the form of an account, stating the car numbers and initial, the amount of corn, and price to be paid by Saylor & Burnett."

The assignments of error present, in substance, the single question of whether the trial court properly held that the shipment or commerce in question was intrastate, rather than interstate, as is contended in behalf of appellant. If the shipment can be properly denominated local or intrastate, then it is admitted that the judgment must be affirmed. If otherwise, then it is as frankly admitted, as it must be, that the Texas Railroad Commission law and regulations have no application, and that the judgment should be reversed, and here rendered for appellant. Gibbons v. Ogden, 9 Wheat., 1, 6 L. Ed., 23; Hardy v. Atchison T. & S. F. Ry. Co., 32 Kan., 698, 5 Pac. Rep., 6; Houston Nav. Co. v. Ins. Co., 89 Texas, 1; 32 S. W. Rep., 889, 30 L. R. A., 713, 59 Am. St. Rep., 17; Fielder v. Missouri K. & T. Ry. Co. (Texas Sup.), 46 S. W. Rep., 633. We have found no case that, as seems to us, presents the precise state of facts; and the difficulty we have had in the solution of the question presented has been in the construction of the facts, rather than in the consideration of the numerous cases which have been considered, but which, in the interest of brevity, we will not undertake to distinguish. We have, however, finally concluded that we can not disturb the trial court's conclusion.

That the transportation of the two cars of corn from Texarkana,

Texas, to Goldthwaite, Texas, to which, at the instance of the Railroad Commission of Texas, the Attorney-General has sought by this suit to have the freight rate fixed by that commission applied, comes literally within the terms of the Texas commission statutes, which undertake to regulate transportation "between points within this State," can not be denied; but the insistence on the part of appellant is that said transportation was but a part of a more extended and continuous shipment from South Dakota or Kansas City, Mo., to Goldthwaite, Texas, and therefore an interstate shipment, subject alone to the through freight rate agreed upon and filed with the Interstate Commerce Commission by the several carriers interested.

It is undisputed that the grain in question was originally shipped from Hudson, S. D., to Texarkana, Texas. When this shipment began in South Dakota, the subject matter of the shipment became an article of commerce between the States of South Dakota and Texas; and this interstate character continued until its arrival at Texarkana, but no longer, as we think must be conceded, unless it can be said that the stoppage in transitu at Kansas City, or the fact of a change in ownership at that point, is of controlling effect to the contrary. The findings and evidence show that the corn constituting the subject matter of the shipment in question had arrived, and had been purchased and placed in the elevators of the Harroun Commission Company at Kansas City, for the purpose of cleaning and sacking, before the contract of the Hardin Grain Company to purchase it. It is not shown or contended that a shipment with stopaver privileges for such purpose is a regulation in contravention of the acts of Congress or of rules of the Interstate Commerce Commission, or that such stipulation is unreasonable, or that it ipso facto changes the character of the original shipment. Such stoppage in transitu is not shown to be colorable, and, if not, seems to be an aid to, and in the interest of, the commerce of the country, rather than the contrary, in that at convenient centers, where facilities therefor have been prepared, large quantities of the subjects of commerce may be concentrated or condensed, and its further transportation largely faciliated, as is the constant practice in the case of cotton in our own State; and we know of no case in which it has been held that a stoppage of such character, and with such temporary purpose, destroys or alters the status of the commodity as fixed by the original shipment. The case of Waggoner v. Whaley, 50 S. W. Rep., 153, by this court, may be referred to as tending to so show. The cattle constituting the shipment in that case were driven from Oklahoma Territory to Waggoner, Texas, and there shipped under a contract fixing Chicago, Ill., as final destination, but with provision for stoppage in transit at Bowie, Texas, for purpose of feeding. From an examination of that case, however, it will appear that Chicago was not the definitely fixed place or ultimate destination at the time of the inception of the transit at Waggoner. The freight had been paid to Bowie only. No definite time of stoppage had been fixed, and, when finally again started

on their journey, new shipping contracts were made, and some of the cattle were shipped to Chicago, some to Kansas City, and some to New Orleans for export; the owner testifying in relation to the original contracts of shipment that "I always had the right, and exercised it, to ship the cattle out from Bowie to any other place, or to sell them to other parties, to be transported from Bowie in any manner or to any place that they might choose, or to do anything else with them that might be desired." The appellants in that case had exclusive control and management of the cattle while at Bowie, and we held that the purpose of the original carriage contracts evidently was to enable the appellants in that case to fatten the cattle at their pens at Bowie, and have them carried to market without the expense of the local freight charge from Waggoner to Bowie; and, so concluding, we held, in effect, that the transit of the cattle, as shown on the face of the original contracts, had been so interrupted as that such cattle had acquired a situs within the State of Texas, within the meaning of our laws on the subject of taxation.

In the case before us now, however, no finding requires the conclusion that at the time of the original shipment in South Dakota any place other than Texarkana was intended as the final destination. As stated, the freight was prepaid to that place, and, after cleaning and sacking, the corn was continued on its journey to Texarkana, consigned to the order of the original shipper, and over the railway in care of which it had been first shipped. We hence conclude that the character of the original shipment was not altered by the mere stoppage in Kansas City. If not, we fail to see why such effect should be given the several sales or contracts of sales shown. The Harroun Commission Company had purchased or contracted for the corn to be delivered at Texarkana some time prior to the later contracts of sale, and, to fill its order therefor, the Hardin Grain Company contracted for Texarkana delivery; not knowing at the time but that the required corn was then there situated. These transactions are not impugned by the findings as having been done in bad faith, or with a purpose to thereby avoid the effect of the interstate commerce law. It is true that the court finds that the Hardin Grain Company bought with delivery at Texarkana, because thereby they could procure corn with which to fill their order for about 1½ cents per bushel less than had the corn been purchased with delivery at Kansas City, and that this difference in price evidently could result only by an application of the freight rates of the Texas Railroad Commission from Texarkana to Goldthwaite, instead of the interstate commerce rate between the same points. But we can not think that these facts require the conclusion that the purchase by the Hardin Grain Company, with delivery at Texarkana, was a mere pretext to avoid the operation of the interstate commerce law. It seems, under the circumstances, rather to have been an advantage taken of an existing condition. The commission company had corn to be delivered at Texarkana. The Hardin Grain Company desired corn, which,

if delivered at that point, would enable them to fill the order of Saylor & Burnett at less cost than if the corn had been purchased and delivered in Kansas City. And while the well-established doctrine of exclusive control of Congress over interstate commerce may be important, yet freedom of contract in relation to the subject matter of such commerce is likewise of vital importance; and such contracts, when made, that in nowise are forbidden by law, and that are not found to be designed with a view of avoiding the legitimate exercise of the power of Congress over the subjects of interstate commerce, should be upheld. The Hardin Grain Company acquired no title or fixed right in the grain in question until its delivery at Texarkana. It was evidently not so intended in advance of delivery, as held in the case of Irvin v. Edwards (Texas Sup.), 47 S. W. Rep., 719, nor was there an examination and acceptance of the corn in Kansas City, so as to there pass title to the Hardin Grain Company, within the principle decided in Maud v. Coppinger (Texas Civ. App.), 56 S. W. Rep., 127. Until actual delivery by the Harroun Commission Company at Texarkana, its mere contract to sell to the Hardin Grain Company could lawfully have been complied with by a seasonable delivery at Texarkana of any other corn of like grade, quality, and quantity. But when delivered as was done, not only the title, but also the actual possession, passed to the Hardin Grain Company. The commission company then lost all further control. The carrier from Kansas City had then entirely fulfilled its contract of carriage; not being required by any law or shipping contract to deliver to a connecting carrier, as in the case of the Houston Nav. Co. v. Insurance Co., 89 Texas, 1, 32 S. W. Rep., 889, 30 L. R. A., 713, 59 Am. St. Rep., 17. After delivery to the Hardin Grain Company at Texarkana, the corn was in possession and control of no other person or carrier in any capacity until that company entered into an absolutely necessary new contract for further transportation. When so delivered, the interstate character of the commodity ceased, and the corn then became in all essential particulars incorporated in the mass of property in this State, and the new shipment which was some five days after the delivery at Texarkana, was substantially a new one.

In the case of Brown v. Houston, 114 U. S., 622, 5 Sup. Ct., 1091, 29 L. Ed., 257, coal was sent by the owners in Pennsylvania to their agent in New Orleans to be there sold for their account. Upon its arrival, taxes were assessed against the coal while contained in barges upon which it had been originally shipped, and before disposition, and the collection was resisted upon the ground that the coal in question had not lost its character as an interstate commerce commodity; but it was held that upon its arrival in New Orleans it became a part of the general mass of property of the State of Louisiana, and this without reference to the fact that the coal at the time of the taxation had not been changed from the form in which it had been originally shipped, and the further fact that some of it had been sold for export. So, here, we do not think that the fact that no change was made at Texarkana

of the grain in question from the cars in which it was originally shipped is decisive in favor of appellant's contention. When delivered at Texarkana the interstate commerce transit was ended, and it is immaterial, it seems to us, whether the corn was then stored in elevators, and thereafterwards sold in Texarkana, or, as was done, shipped to Goldthwaite to complete the contract of sale made by the Hardin Grain Company with Saylor & Burnett.

The foregoing view also harmonizes with the view of this court in the unreported case of Southern Kansas Railway Company of Texas v. Stump & Weaver, appealed from Roberts County, and decided March 6, 1897. That was a case in which Stump & Weaver, at Miami, ordered of John Haggart, at Panhandle City, a certain car of coal for delivery at Miami; both these points being situated in Texas. To fill this order, Haggart purchased the coal in the State of Colorado, and caused it to be shipped to Panhandle City, where it was unloaded, reloaded by Haggart upon other cars, and reshipped to Miami. This court held that the interstate shipment ended at Panhandle City, that the shipment from that point to Miami was an intrastate shipment, and that the rates of the Texas Railroad Commission applied thereto, rather than those of the Interstate Commerce Commission. The case of State v. Southern Kansas Railway Company of Texas (Texas Civ. App.), 49 S. W. Rep., 253, based upon a very similar state of facts, may seem, as is urged, to conflict therewith. The cases, however, are apparently distinguishable, at least as appears to some of us, in that in the case by the Court of Civil Appeals of the Third District, last above referred to, it was expressly found, in effect, that, at the time of the order by Stump & Weaver, they, as well as Haggart, contemplated that the coal would be purchased in Colorado, and that the shipment was made to take the form it did with a view to thereby evade the operation of the interstate commerce rate of freight from Panhandle City to Miami, which was greater than the Texas rate. No such state of facts was found in the case by this court referred to. It is insisted, however, that the purpose or intent of the parties is irrelevant and immaterial. It may be and is doubtless so, when such purpose does not enter into the question of fact involved. But when necessary to determine the character of the shipment, or the status of the property as interstate commerce or otherwise, it may undoubtedly be considered. The purpose of the shipper, as an element of the fact to be found, was ascertained and given effect not only in the cases of Waggoner v. Whaley and State v. Gulf C. & S. F. Ry. Co. (Texas Civ. App.), 44 S. W. Rep., 542, but also in Cutting v. Florida Ry. and Nav. Co. (C. C.), 46 Fed. Rep., 641, as may be seen from an examination of those cases. See, also, section 7, Interstate Commerce Act, page 3159 (3 U. S. Comp. St., 1901).

While perhaps at the risk of being considered prolix, we will add, in view of the importance of the question under consideration, that whether or not the transportation between the Texas points was a constituent

of a continuous shipment of interstate commerce does not necessarily depend upon the fact that the corn was imported from South Dakota or Kansas City to Texarkana, Texas, immediately preceding its transportation to Goldthwaite, Texas, nor upon the fact that it was carried to the last named place in the same cars in which it had been carried from Kansas City, but rather upon the character of the transaction between the Samuel Hardin Grain Company and Saylor & Burnett, in pursuance of which the corn was carried from Texarkana to Goldthwaite, or, in other words, whether the Samuel Hardin Grain Company, in selling and shipping the corn for delivery to Saylor & Burnett, were engaged in State or interstate commerce. That the transaction between the Samuel Hardin Grain Company and the Harroun Commission Company, in pursuance of which the corn was forwarded from Kansas City to Texarkana, and there delivered by the latter to the former, was one of interstate commerce, does not admit of controversy. But because the Samuel Hardin Grain Company were engaged in interstate commerce in buying the corn does not prove that they were also engaged in interstate commerce in selling it. Every wholesale dealer in Texas may be said to be engaged in interstate commerce when he makes purchases in pursuance of which goods are shipped to him from other States, but it would not do to hold that in selling and reshipping these goods to his Texas customers he is also engaged in interstate commerce, even though he should reship them in the same cars, and to fill orders accepted prior to the purchase of the goods. The purchase from the nonresident owner, and the through shipment in pursuance thereof, constitute interstate commerce; but when that transaction is fully accomplished, and the resident dealer becomes the owner and possessor of goods situated in Texas—goods which have thus reached the destination given them by the seller and shipper—they become a part of the general property of the State, and, if sold and reshipped to another point in the State, such sale and shipment constitute commerce within this State, and not interstate commerce. This principle was applied by this court in deciding the case of Southern Kansas Railway Company v. Stump & Weaver, before referred to. As a purchaser and importer of Colorado coal, Haggart was engaged in interstate commerce, but in selling and reshipping it to his Texas customers he was engaged in State commerce; and we held in that case that the nature of his local business was not changed merely because when he ordered a given car of coal from Colorado he intended to reload and reship it from Panhandle to Miami to fill an order already placed with him by Stump & Weaver, who were engaged in business at the latter place. We see no reason to doubt the soundness of that decision, and the only question of difficulty is whether this case comes within the ruling there made. The Samuel Hardin Grain Company had no office or place of business in Texas, and may thus be said to be in a position different from that of Haggart; their business being, as testified by the manager, "that of soliciting orders from Kansas, Missouri, Indian Territory, Texas,

and other States, and, when such orders are [were] received, to buy the commodities and fill such orders as quickly as possible," with their office in Kansas City. But it matters not what their general course of business may have been, provided in this instance they were engaged in commerce within this State; and we have finally concluded that they were, or at least that we would not be warranted in disturbing the trial court's finding to that effect. If the two cars of corn had reached Texarkana, the ultimate destination of the original shipment, and had been there delivered to the Harroun Commission Company before any negotiations took place between the two companies at Kansas City, and the grain company had then bought and reshipped the corn to Goldthwaite, the transaction would undoubtedly have been entirely local. Brown v. Houston, 114 U. S., 5 Sup. Ct., 29 L. Ed., supra. But under the peculiar facts of this case, should not the corn be treated as constructively in Texarkana, where it was then due, as its place of destination under the then pending shipment, with all freight charges paid, when the negotiations took place at Kansas City? We incline to think so. Certain it is that the parties did not understand or intend that the grain company should acquire any title to or have anything to do with the corn till it was delivered to them in Texas.

The court found against the contention—the most plausible urged by appellant—that the transactions took the form they did to disguise a real interstate shipment and we feel bound to respect this finding. We think, therefore, the case is not to be distinguished in principle from Railway Co. v. Stump & Weaver, supra, which we think was correctly decided, and we know of no decision of our Supreme Court or of the Supreme Court of the United States in conflict with it; and the judgment will be accordingly affirmed.

*Affirmed.*

Writ of error granted and judgment affirmed.