ST. LOUIS & SAN FRANCISCO RAILWAY COMPANY ET AL. v. F. O. NELSON.

Decided February 4, 1899.

**1. Custom—Evidence Must Show It General.**

Rules of three particular railroads on the subject of ringing bells and giving signals by engineers when moving and about to move their engines do not afford proof of a general custom by which to determine the issue of negligence of another railroad.

**2. Evidence—Life Tables.**

Life tables are inadmissible in an action for personal injuries not resulting in death or total disability.

**3. Same—Expert Testimony to Show Negligence.**

Expert testimony of railroad men that the act of a conductor in going between cars to close an angle cock while an engine was backing up to the cars was imprudent and dangerous, is inadmissible, since the question of negligence in such case is an issue to be determined by the jury on all the circumstances.

**4. Master and Servant—Negligence and Assumed Risk.**

Refusal of special charges on assumed risk and open, visible dangers is reversible error in an action by a freight conductor against a railroad company for injuries sustained by him in making up his train, while attempting to close an angle cock, where he went in between the cars to do so, knowing the engine was then coming back against them to make a coupling.

**5. Proximate Cause.**

A conductor's failure to obey a bulletin order of the company requiring him to arrange the cars in his train at a given station, whereby it became necessary for him to make such arrangement at a station beyond, and in doing which he was injured, is not the proximate cause of the injuries such as will bar him from recovering therefor.

**6. Same—Negligence Too Remote.**

Failure of the yardmaster to properly make up a train, and to inspect the cars at a given station, is too remote a cause to afford a charge of negligence against the company by a freight conductor for injuries sustained by him while making up the train at a station beyond and closing an angle cock that had been left open and which did not close readily.

APPEAL from Lamar. Tried below before Hon. E. D. McCLELLAN.

*H. D. McDonald* and *L. F. Parker,* for appellants.

*Hale & Hale* and *E. W. Fagan,* for appellee.

FINLEY, CHIEF JUSTICE.—This suit is by appellee against the appellants, the St. Louis & San Francisco Railway Company and the Paris & Great Northern Railway Company, for damages for personal injuries received by appellee by having his arm crushed between two drawheads

while acting in the capacity of freight conductor. A trial at spring term, 1898, resulted in verdict and judgment for appellee for $5000. Motion for new trial having been overruled, notice of appeal was given and appeal has been duly perfected.

The evidence introduced upon the trial tended to show these facts: On the morning of January 19, 1897, plaintiff, as conductor of a freight train on defendants' road, left Paris, which was a terminal, in charge of such train, north bound, and having in his train an empty box car to be left at Arthur, a station about sixteen miles from Paris. Prior to the departure of this train from Paris, defendants had issued and posted, and plaintiff had read, Bulletin No. 7, which reads as follows:

"FORT SMITH, ARK., Jan. 18, 1897.

"Bulletin No. 7.—To all Freight Conductors and Engineers:

"Arrangements have been made to have air cars switched ahead at terminals so that we may have the full benefit of the air brakes in moving trains over the road. Where there is a sufficient amount of air to control the train, hand brakes should not be used. The air brakes must be carefully tested at terminals and also after setting out or picking up cars while on the road, and you must know that the brake is in good working order at all times. Conductors will be held responsible for this test.

"W. W. ASHALD, Train Master."

There were twenty-five or thirty cars in the train, five or six of them being equipped with air brakes, and the remainder with hand brakes only. The engine was equipped with air, as was a coal.car that was next to it. When the train left Paris these air cars were scattered at different places through the train, with nonair cars intervening between them, so that the air could not, with the cars in that condition, be used to handle the train. The five or six air cars were sufficient when put together at the head of the train, and connected up together and to the engine with the air apparatus, to handle the train with, without the use of hand brakes, the engineer thus being enabled to handle it by the application of the air brakes. It was the duty of the yardmaster at Paris to make up the train, and he should have arranged the air cars together at the head of the train. Before arriving at Arthur plaintiff had given orders to his crew to switch the air cars ahead at that place, so that they could be assembled at the head of the train next to the engine and the air connected up. Plaintiff was having this done in pursuance of the requirement of Bulletin No. 7, as he understood and construed them.

Arriving at Arthur, plaintiff first had the empty box car that was to be left there cut off. It was cut off behind at the switch, given a "kick," and plaintiff himself "rode" it back into the side track and set the brake on it. He rode it back in far enough so as to give room on the side track in front and north of it to hold the air cars that were to be switched ahead. Plaintiff then told the head brakeman they would switch the air cars

ahead. This work of switching the air cars ahead was then proceeded with, plaintiff himself assisting in it. He cut off the air cars and "rode" them in on the side track until he had thus assembled five of them, which he thought was sufficient to handle the train with. The tracks at Arthur run north and south, the side track being on the east and main track on the west. The engine and train were headed and going north, and the switch stand used in letting the air cars in onto the side track was located at the north end of the side track. There was a curve in the side track at the north end. The switch stand was located on the east side of the side track at the north end. The engineer's place was on the east side of his cab, the fireman's on the west, and they were so placed all the time.

The conductor's orders were given to the head brakeman, and he in turn communicated them by signal to the engineer, and such orders were carried out on this occasion as given by the conductor. It was the duty of the head brakeman to operate the switch for all of this work, and he did it.

After the five air cars had been thrown in on the side track, plaintiff ordered the head brakeman to have the engine (with the coal car attached to it) brought in on the side track to get the air cars. At the time plaintiff gave this order to the head brakeman they were both standing right up pretty near the engine, and the engine was about on the frog at the north switch. They were both standing between the main and side tracks near where they come together. The empty box car that was to be left at Arthur was standing on the side track about eight car lengths down south from the north switch, and the rear end of the last air car (the first one that had been let in on the side track) was somewhere between three and eight feet from the front end of the empty box car— that is, that was about the space between them as they stood just before the accident. From the north switch down to the front end of the string of air cars as they stood on the side track was about a car and a half length. Upon plaintiff's giving the head brakeman the order to have the engine brought in on the side track to get the air cars, the head brakeman communicated the order to the engineer by signal, and plaintiff immediately turned and started south, walking down between the two tracks, towards the rear end of the train. The engineer, on receiving the signal, immediately went ahead so as to clear the switch, and the head brakeman crossed over the side track to the switch stand on the east side of it so as to throw the switch to let the engine in on the side track. Shortly after this signal was given to the engineer and the switch thrown, the engine came in on the side track and coupled onto the air cars. As plaintiff, after giving the order just referred to, proceeded on his way towards the end of the train, upon reaching the rear end of the last air car he noticed that the angle cock on that end of the car was not in position so that the air could be used; that is, it was only partially closed. The angle cock is a cock at the end of the air hose on each car so equipped which is intended to be opened or closed as wanted, and has a handle five or six inches long by which the opening or closing is effected. This

handle is intended to be worked with the hand.. Plaintiff first tried to close it with his hand, but couldn't; he then stepped back to the empty box car that had been thrown in there to be left, got a pin, and was hammering on the angle cock with it trying to thus close it when the engine came back against the cars, shoving the rear car against the empty box car and catching and crushing plaintiff's right arm between the drawheads of the two cars, necessitating amputation. There was no defect about this angle cock, unless the difficulty in turning it with the hand could be called a defect. These angle cocks usually work easily, but sometimes they have to be pounded with a pin or something of the kind to make them turn. The bell on the engine was not heard by the appellee, but the other employes testified that it was rung all the time as the engine was going into the side track. The coal car attached to the engine and the first of the air cars to which it was to be coupled were both equipped with automatic couplers, and did not have to be coupled with the hands. Ordinarily no more force is required to make a coupling with these automatic couplers than with the ordinary pins. This coupling had to be made on the curve in the side track, which fact required some more force than is usual on a straight track; but in making this coupling no more force or speed was used than was necessary. Plaintiff went in between the cars where he was hurt from the west side, and thrust his arm in between and through the drawheads, passing the same over onto the east side of the car where the angle cock was located. Neither the engineer, fireman, nor any of the crew knew that plaintiff was in between the cars, or was going in between them, and plaintiff himself knew they did not know it. From where plaintiff was working on the angle cock to the places respectively occupied by the engineer, fireman, and head brakeman the view was obstructed and they did not and could not see each other. When plaintiff went in between the cars he knew the engine was going to come back against them; he also knew that he was going into a place of danger, but he thought he could go in there, fix the angle cock, and get out before the engine would strike the cars. In making these couplings the cars are usually knocked back, and it is dangerous to be between or behind the cars when couplings are about to be made.

This train was made up at Paris, which is a terminal. Plaintiff did not test the air brakes at Paris. He knew before he left Paris that the air cars in his train were not switched ahead; he knew that under Bulletin No. 7 they were required to be switched ahead at that point; he knew that bulletin required him to see that the air was tested at Paris, a terminal. But it was the duty of the yardmaster to make up the train, and he regarded it to be his duty to take the train out as it was made up by the yardmaster. After the train left the terminal it was entirely under his control. He took the train out without the air cars being switched ahead and without testing the air. Plaintiff did not examine the angle cock before leaving Paris; if he had done so he would have seen that it was hard to turn by hand.

At the time of this accident and always before then defendants had in

existence and force a rule printed on all their time cards, which reads as follows: "Employes of every rank and grade are warned to see for themselves, before using them, that the rolling stock, machinery, or tools which they are required to use are in safe condition, or that they are so put before using." Plaintiff was familiar with this rule and had always been.

Plaintiff offered in evidence rule 66 of the Missouri, Kansas & Texas Railway Company, reading as follows:

"The unnecessary use of the whistle is prohibited; when necessary in shifting at stations and in yards the engine bell should be rung, and the whistle used only when required by rule or law, or when necessary to prevent accident."

And rule 173 of the Gulf, Colorado & Santa Fe Railway Company, reading as follows:

"Enginemen will use great care in backing up to take a train, or backing into a side track to take or leave cars, and will approach so slowly that they may be coupled without injury to persons or property."

And rule 31 of the Texas & Pacific Railway Company, reading as follows:

"The unnecessary use of the whistle is prohibited; when switching at stations and in yards, the engine bell should be rung, using the whistle only when required by law or when absolutely necessary to prevent accident."

Plaintiff testified that defendants had no rule of that kind. The engineer Harlan testified that they did, but could not show any such printed rule.

Plaintiff proved that his life expectancy was 38-81 years. At the time of the trial plaintiff was a perfectly stout and healthy man, with no defects except the loss of his arm. He was then engaged in practicing law.

The defendants proved by ten expert railroad men that under the circumstances shown by the evidence the proper thing for appellee to have done on discovering that the angle cock was not closed was not to have gone in between the cars at that time to close it,—but he should have waited until after the coupling had been made.

This statement of the evidence is mainly taken from appellant's brief, and is only designed to serve the purpose of making clear the points considered and passed upon in the opinion of the court.

*Opinion.*—1. Appellants first urge that the court erred in permitting the appellee to introduce in evidence the rules of the Missouri, Kansas & Texas, Gulf, Colorado & Santa Fe, and Texas & Pacific railway companies on the subject of ringing bells and giving signals by engineers when moving and about to move their engines. It is asserted that the principle of law rendering such evidence inadmissible, as irrelevant and immaterial, is so elementary that no citation of authority is deemed necessary. In Railway v. Harriet, 80 Texas, 73, the Supreme Court held that, on the issue whether it was negligence to send out a water train

without a conductor, the custom of other railroads in that respect was competent evidence. In Railway v. Reed, 88 Texas, 449, it is said on the issue of negligence in failing to provide a sufficient train crew, evidence as to the custom of other railroad companies may be admitted as a circumstance tending to show that the crew in the particular case was not sufficient. In Gillet on Indirect and Collateral Evidence, section 128, the rule is thus stated: "In the majority of negligence cases the question of negligence is of such a character that it must be presumed that the jurors, representing men taken from the various walks of life, are competent to decide the question upon ascertaining the immediate facts, and upon being advised of the law. In such cases there is no occasion to appeal to the habits or customs of others to aid the jury. But in cases where the question involved is of such a character that the jury will be aided by being advised of the practices of others under like circumstances such evidence is competent, at least where the custom is a general or universal one. The very fact that it is general or universal tends strongly to show its reasonableness." These authorities give sanction to evidence as to the general custom of others, but we do not think they authorize proof of the rules of certain particular railroads on the subject. Proof of the fact that the three particular railroads named had rules on the subject did not show that railroads generally had provided such. Certain particular railroads can not be selected out and used as standards by which to determine the issue of negligence of another railroad. The evidence, in the form presented, was not admissible.

2. It is also presented that the court erred in permitting appellee to prove his life expectancy from life tables.

Appellee's injury consisted in the loss of one arm, and resulted in only a partial, not a total, impairment of his ability to earn money. Where the injury has not resulted in death or total disability, such evidence should not be admitted, as it would tend only to confuse the jury upon the measure of damage. Railway v. Douglas, 69 Texas, 699.

3. The rejection of expert testimony to the effect that the act of appellee in going between the cars and pounding the angle cock in order to close it, under the circumstances shown by the evidence, was not safe and prudent, but was a dangerous and improper thing for him to do, is assigned as error. The court did not err in excluding this evidence. Whether appellee was guilty of negligence proximately causing his injury was an issue of fact to be determined by the jury from all the facts and circumstances of the case, and not a matter to be determined on the opinions of expert witnesses. Sonnefield v. Mayton, 39 S. W. Rep., 166; Rogers on Exp. Test., pp. 15-17. It appears that the court did admit a mass of testimony practically to the same effect as that rejected.

4. The refusal of special charges asked upon the subject of assumed risks and that of open visible dangers is complained of. The pleadings and evidence required appropriate charges upon these phases of the case. On these points the general charge is silent, notwithstanding the special charges called attention directly to them. This was error.

5. Appellant also asked special charges to the effect that it was the duty of appellee to obey the established rules and regulations of the company, and that it was his duty to obey Bulletin Order No. 7, pleaded and shown in evidence, and if he failed in such duty and such failure was the proximate cause of his injury, he could not recover.

The pleadings furnished sufficient basis for such charges; but in our opinion the evidence was such that to have given the charges would have served only to becloud the real issues in the case. Let it be admitted that the evidence showed that appellee violated the rules of the company and Bulletin Order No. 7 by failing to personally examine his cars and train at Paris and seeing to it that the cars were in order and that the air cars were connected and put at the head of the train as required by said bulletin. The evidence conclusively shows that his injury was not super-induced by defective machinery, or the manner in which the train was made up at Paris. Neither of these can be regarded as an effective cause of the injury. It is true that the manner in which the train was made up at Paris furnished the occasion for the switching of the cars at Arthur, and the fact that the angle cock was open and hard to close gave rise to the occasion for appellee to go between the cars and pound the angle cock for the purpose of closing it. But there is quite a distinction to be drawn between the matters which furnish the occasion and those which are to be deemed the efficient cause of the injury. He was not injured by reason of the manner in which the train was made up at Paris; this only produced the occasion for him to have the train rearranged at Arthur, putting the air cars together in the front part of the train next to the engine. He was not injured by a defective angle cock; the fact of it being open and hard to close only brought about the occasion for him to close it by beating upon it. While he was performing this work, he was injured by the engine pushing a car back against the one he was working upon, bringing the two drawheads together and crushing his arm. Had he rearranged his train at Paris, he would not have had it to do at Arthur; but he might have been injured in the same way in the work at Paris. There is no causal connection between his alleged failure in duty at Paris and the crushing of his arm while between the cars at Arthur, and the issue should not have been given to the jury. Just here it is convenient to pass upon the question as to the failure of the yard-master to properly make up the train at Paris, and failure to inspect the cars and remedy the condition of the angle cock at Paris, which are charged against the company as negligence.

The court was asked to exclude these charges of negligence from the jury, and did not do so. What we have just said as to the charges of dereliction against the appellee applies with equal force to these failures of duty at Paris alleged against the company. The causal connection was broken, and they were too remote to furnish the ground for recovery. We discussed this question in the case of Railway v. Woods, 8 Texas Civil Appeals, 466, 467, and there held that where a passenger was wrongfully carried beyond her destination and the train was stopped for

her to disembark, and she was injured by the *manner* in which she got off the train, the negligence of the company in not affording her an opportunity to leave the train at the point of her destination could not be regarded the proximate cause of the physical injuries she received while getting off the train.

The petition set forth these grounds of negligence: First, failure of the defendants to connect the air cars and put them at the head of the train at Paris, as required by Bulletin Order No. 7; second, the failure to properly inspect the cars at Paris and see that the angle cocks were in proper condition; third, failure of defendants to provide rules for giving signal notice of movements of engines while switching cars, making up trains, etc.

It is not urged that a recovery may be had based upon any negligence of the engineer or brakeman. Under the facts developed, the first two grounds stated were too remote, and the only issue of culpable negligence which can be considered as having any basis in the evidence which required its submission to the jury was the alleged failure to provide adequate rules for the protection of employes while cars are being switched and trains made up. On the other hand, the defensive issues of assumed risks and contributory negligence were properly raised by the pleadings and evidence.

We do not regard it as necessary to go further in the discussion of points raised on this appeal, believing that the views expressed will lead to a proper submission of the case to the jury upon another trial.

For the errors indicated, the judgment is reversed and cause remanded for another trial.

*Reversed and remanded.*