MISSOURI, K. & T. RY. CO. OF TEXAS v. PACE.  (No. 8308.)

(Court of Civil Appeals of Texas. Ft. Worth. Feb. 19, 1916. Rehearing Denied March 18, 1916.)

1. COMMERCE ⟷33 — RAILROADS — "INTERSTATE COMMERCE"—INJURIES IN INTERSTATE COMMERCE.

A shipment of coal billed to a point in another state, from which, although without reloading or unloading, it was then billed to a point within such state, was not interstate as to the second shipment.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 26, 81; Dec. Dig. ⟷33.

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. COMMERCE ⟷27—RAILROADS—INJURIES TO SERVANT—"INTERSTATE COMMERCE."

The mere fact that it does not appear whether cars were unloaded and reloaded within the state, or that the goods were in the same cars at a point without the state, is not determinative of whether the shipment was interstate, and where at the time of shipment a destination within the state only was contemplated the state statutes control the railroad's liability for injury to a servant engaged in such shipment.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ⟷27.]

3. MASTER AND SERVANT ⟷204(1)—INJURIES TO SERVANT — DEFENSES — ASSUMPTION OF RISK—COMMON-LAW RULE.

The common-law defense of assumed risk still obtains, except as limited by Vernon's Sayles' Ann. Civ. St. 1914, art. 6645.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 544; Dec. Dig. ⟷204(1).]

4. MASTER AND SERVANT ⟷295(1)—INJURIES TO SERVANT — DEFENSES — ASSUMPTION OF RISK.

Where the defense of assumption of risk is expressly limited under certain conditions by Vernon's Sayles' Ann. Civ. St. 1914, art. 6645,

an instruction requested by defendant on the issue of assumption of risk, which failed to negative those conditions, is properly refused.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1168, 1169, 1179; Dec. Dig. ☞295(1).]

5. NEGLIGENCE ☞141(6) — REDUCTION OF COMPENSATION.

In a servant's action for injuries arising out of and in the course of his employment, defended on the ground of contributory negligence, the issue of the amount to which his compensation should be reduced by reason of such contributory negligence, must be submitted, no standard for determining whether the compensation allowed is excessive being otherwise possible.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 387; Dec. Dig. ☞141(6).]

6. APPEAL AND ERROR ☞934(2) — SCOPE OF REVIEW—PRESUMPTIONS.

Every reasonable presumption must be indulged in favor of the judgment rendered, and a special verdict should be liberally construed in order to sustain it.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. ☞934(2).]

7. TRIAL ☞352(1)—SPECIAL VERDICT—SUFFICIENCY.

A special verdict must directly, fairly, and fully submit to the jury material issues and be sufficiently certain to stand as a final decision of the special matters with which it deals.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 840; Dec. Dig. ☞352(1).]

8. NEGLIGENCE ☞142—INJURIES TO SERVANT —AMOUNT OF AWARD.

A special verdict in a servant's action for injuries, defended on the ground of contributory negligence, awarding him $17,500 where the demand was $50,000, was too indefinite to stand, since it could not be determined in what amount his contributory negligence reduced the verdict if at all.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 400–403; Dec. Dig. ☞142.]

9. MASTER AND SERVANT ☞291(3)—INJURIES TO SERVANT — ACTIONS — INSTRUCTIONS — PLEADINGS—SUFFICIENCY.

An allegation that the master negligently furnished the servant with an engine out of repair as to its sand pipe, will support an instruction that it was the master's duty to exercise ordinary care to furnish an ordinarily safe engine and to have it inspected and repaired, especially where the specific duty was by later instruction specifically defined.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1136; Dec. Dig. ☞291(3).]

10. MASTER AND SERVANT ☞270(15)—INJURIES TO SERVANT—ACTIONS—EVIDENCE—ADMISSIBILITY.

In an engineer's action for injuries received when he attempted to replace a sand pipe with his foot while the engine was in motion, it is not error to permit him to testify that such was the custom since it might reasonably be presumed that the general custom was acquiesced in by the master.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 925; Dec. Dig. ☞270(15).]

11. MASTER AND SERVANT ☞135—INJURIES TO SERVANT—ACTIONS—DEFENSES—CUSTOM.

The master, in order to avoid the charge of negligence, cannot rely upon failure of others in similar circumstances to perform a duty, the violation of which is the subject of complaint.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 271, 281, 293; Dec. Dig. ☞135.]

12. MASTER AND SERVANT ☞127—INJURIES TO SERVANT—LIABILITY—NEGLIGENCE.

A railway company is not guilty of negligence per se for failure to take precautions which other railways observed in keeping their engines in repair.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 252; Dec. Dig. ☞127.]

13. EVIDENCE ☞539 — EXPERT WITNESS — WHO ARE EXPERT WITNESSES.

Where an injured engineer testified to an experience with engines covering more than 35 years, it is not error to permit him to testify that he did not believe a sand pipe could be displaced with a blow of the foot, since in so testifying he might be regarded as an expert.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2349–2352; Dec. Dig. ☞539.]

Appeal from District Court, Tarrant County; J. W. Swayne, Judge.

Action by C. L. Pace against the Missouri, Kansas & Texas Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Thompson & Barwise, A. C. Wood, and G. W. Wharton, all of Ft. Worth, for appellant. D. W. Odell, T. J. Powell, and Gaines B. Turner, all of Ft. Worth, for appellee.

BUCK, J. Suit was instituted in the Seventeenth district court of Tarrant county, Tex., by C. L. Pace against the Missouri, Kansas & Texas Railway Company of Texas for damages for personal injuries sustained. Plaintiff alleged that on the 24th day of February, 1913, he was an employé of defendant railway company in the capacity of locomotive engineer, and as such was operating one of appellant's engines attached to a string of cars which were to be carried south from Ft. Worth on appellant's line. It was further. alleged that as part of the equipment of said engine there was attached a box of sand with an iron pipe extending from said sand box to a point immediately above the rail, so that the operator of such engine, by opening a valve in said pipe, could scatter sand along said rail and thereby assist in the movement of the engine. It was alleged that the sand pipe was out of order, in that it was loose and carelessly adjusted, and did not deposit the sand on the rail, but on the ground some 4 or 5 inches outside the rail; that when the plaintiff had taken his position on the engine in question and turned on the sand, he discovered the defect, and that while the engine was slowly starting, he dismounted from the engine to examine the sand pipe in order to determine whether or not it would be necessary to stop the engine and send it to the shop for repairs; that while said engine was in very slow motion, plaintiff, for the purpose of determining the condition of said sand pipe, placed his foot gen-

tly against the pipe, assuming that it was reasonably securely adjusted, as same should have been, and as was usual and customary for it to be, and that in so doing his leg was caught under the wheels and across the rail in front of said moving engine, thereby crushing his leg and making it necessary to amputate it about 9 inches below the knee.

Plaintiff alleged that it was negligence on the part of defendant to have the sand pipe in the condition it was, and that same contributed directly and proximately to the accident and injuries complained of; and further alleged that it was no part of plaintiff's duty to inspect said engine or its appliances, and that he did not know that said sand pipe was defective and·out of repair at the time he took charge of the engine, but that he supposed that it was reasonably tight, and, at the time of placing his foot against it, supposed that it had been forced out of its proper position by some external force, as frequently occurs in the operation of the engine, and that said sand pipe would oppose considerable resistance to the pressure of his foot thereon, and that while testing it, as above set out, he was acting in a careful and prudent manner, and in the usual and customary manner used by engineers in such matters.

Plaintiff further alleged that he was an experienced and competent engineer and was then earning, and capable of earning, from $200 to $250 per month at his said occupation; and that by reason of the injuries received, he had become wholly incapacitated from following his said occupation; that his capacity to labor and earn money had been very greatly diminished and almost destroyed; that he had been thereby rendered a hopeless cripple for life and had suffered, and would continue to suffer, much physical pain and mental anguish. He sued for $50,000 damages.

Defendant answered, denying negligence in any of the respects alleged; pleaded contributory negligence on the part of plaintiff, and, further, that at the time of the injury it was engaged in handling and moving interstate commerce, and invoking the federal statutes pertaining thereto; and further pleaded assumed risk.

Plaintiff denied that the defendant and plaintiff at the time of the injury were engaged in interstate commerce, and denied that plaintiff was guilty of contributory negligence or that he assumed the risk incident to the use of the engine with the defective sand pipe aforesaid.

The cause was submitted to the jury on eight special issues upon which the jury found:

(1) That the sand pipe, at the time of the accident, was loose and unadjusted, and unfastened in or near the socket where it should be attached to the sand box.

(2) That the defendant was guilty of negligence in turning the engine over to the plaintiff, for his use as an engineer, in the condition in which it was at the time of the injury.

(3) That the negligence of the defendant was the proximate cause of the injury suffered by plaintiff.

(4) That the plaintiff was guilty of contributory negligence in placing his foot upon or against, or kicking, the sand pipe at the time and under the circumstances related.

(5) That the plaintiff was injured, substantially, as pleaded.

(6) That the plaintiff will continue to suffer pain and mental anguish as a result of the injury.

(7) That plaintiff's capacity to labor and earn money has been diminished as a result of his injury.

(8) That $17,500 was a reasonable, fair, and just compensation to him for suffering, loss of time up to the time of the trial, and for diminished capacity to labor and earn money in the future.

Upon this verdict the court entered judgment for plaintiff in the sum of $17,500, and defendant appeals.

Further pleadings and instructions given and refused by the court will be noted as may be necessary in the course of this opinion.

[1] The first question which we will consider, as raised in appellant's first assignment of error, is: Was the defendant at the time of the injury engaged in interstate commerce? The evidence shows that at the time of the injury the engine was pulling a train composed mostly of coal cars, with some loaded box cars next to the caboose. It is as to these coal cars that the insistence is made that the interstate character of the service was determined. The coal had been mined and purchased by the defendant at points near McAlester, Okl., and had been billed to Denison, Tex., and from Denison had been routed to the Bellemead Yards, some 3 miles north of Waco, Tex. W. E. Florentinc, witness for defendant, testified:

That he was car distributor for the defendant railway company, working under the superintendent of transportation, O. C. Smith; that the coal was brought in from Oklahoma to Denison for the use of the company at Smithville, Waco, Ft. Worth, and other points; that the greater part of it was used for engines on its freight and passenger trains, a little being used for stationary engines and some at passenger stations for heating, and some at water tanks for pumping; that coal for engine purposes is placed in coal chutes and the engines are loaded from the chutes; that during February, 1913, the defendant railway company handled through passenger trains through Denison going north, containing passenger coaches, baggage cars, and sleepers, originating at points like Houston and San Antonio; that the division point between the Missouri, Kansas & Texas Railway Company, and the Missouri, Kansas & Texas Railway Company of Texas is Red river, the first-named road operating through Oklahoma and north, and the second lying entirely within Texas; that freight cars coming from the south and going north of Denison were received and some of them were unloaded and reloaded at Denison and some went right

through; that in February, 1913, it was a practice to handle interstate business through Denison, both into and out of the state of Texas; that one of the cars in question was billed from McAlester, account of Adamson, to Denison, February 21, 1913, loaded with mine run coal, and consigned to the Missouri, Kansas & Texas Railway Company of Texas; that this waybill brings it to Denison; that another car was billed "Denison, account Ray Yards, to Smithville, February 23d; that is, Smithville, Texas. Ray Yards is 3½ or 4 miles out of Denison. It is the place freight trains are made up. It shows Denison made this bill for Ray Yards because there is no agent there. No. 3 is B & O 38662 billed North McAlester, account of Adamson, Okl., February 22, 1913, a car of coal for the Katy. This means that North McAlester made the bill because there is no agent at Adamson. The coal, however, was loaded at Adamson, Okl. Adamson is about 13 miles from McAlester on a branch line. No. 4 covers the same car. * * * billed out of Denison, account of Ray Yards, February 23, to Bellemead. * * * I should judge neither of these cars were unloaded at Denison, from the billing, but can't swear they were not."

Further examination of this witness and of other witnesses disclosed that the cars of coal out of Oklahoma were billed to Denison; that some of it was used at Denison in supplying trains and for other purposes, and other cars were from there forwarded under new bills of lading to various points on defendant's lines of railway in the state; that in some instances the coal was forwarded to Texas points in the same cars in which it had been shipped from Oklahoma points, and in other cases the coal was unloaded at Denison, put in chutes, and from the chutes loaded into other cars to be shipped to Texas points.

We think the evidence fully sustained the conclusion that at the time of the shipment from the Oklahoma point of origin there was no other definite point of destination in the mind of the shipper except Denison, and that the further disposition of such shipments was left to be determined after the shipments reached Denison, and depended upon the demand for coal, either at Denison, or at other points in Texas. We are of the opinion that, under this state of facts, the shipment of the cars of coal in the train pulled by the engine of which the appellee was in charge at the time of the injury was not impressed with an interstate character, but constituted an intrastate shipment.

The case of G., C. & S. F. Ry. Co. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540, seems to be directly in point. In that case, suit was brought by the state in the district court of Tarrant county, Tex., to recover a penalty for alleged extortion in a charge for the transportation of a carload of corn from Texarkana to Goldthwaite, Tex. It appeared from the findings of the trial court, Associate Justice Dunklin being then the presiding judge of the trial court, that the Texas & Pacific Railway Company executed a bill of lading, by which it acknowledged the receipt from the Samuel Hardin Grain Company at Texarkana, Tex., of one car of sacked corn, consigned to shippers, with orders to deliver to Saylor & Burnett, at Goldthwaite, Tex. This car of corn was transported by the Texas & Pacific Railway Company to Ft. Worth, there delivered to the Gulf, Colorado & Santa Fé Railway Company, and by it transported to Goldthwaite. Upon its arrival at Goldthwaite, Saylor & Burnett tendered the charges prescribed by the state railroad commission, which the agent declined to accept, and demanded and collected a larger sum. Upon this action by the agent of the railway company, the state brought the suit, alleging extortion as aforesaid. It appeared that the Samuel Hardin Grain Company at Kansas City, Mo., offered to sell to Saylor & Burnett at Goldthwaite, Tex., the corn at an agreed price; that the Hardin Grain Company contracted with the Harroun Commission Company of Kansas City, for the delivery at Texarkana to the Hardin Grain Company of two cars of corn of the prescribed kind; that previously to this the Harroun Commission Company had contracted for the purchase of two cars of corn to be delivered at Texarkana, and with these two cars is expected to fill, and did fill, the order of the Hardin Grain Company. These cars originated at Hudson, S. D. The contention was made by the state of Texas that the shipment from Texarkana to Goldthwaite was an intrastate shipment, and the claim made by the railway company was that, because of the fact that the shipment had originated in South Dakota, it was an interstate shipment. From a judgment in favor of the state, the cause was appealed to this court, and, in an opinion by Chief Justice Conner (32 Tex. Civ. App. 1, 73 S. W. 429), the judgment was affirmed. A writ of error having been granted by the Supreme Court of Texas, later, in an opinion by Chief Justice Gaines (97 Tex. 274, 78 S. W. 495), this court was sustained. The cause having been carried to the United States Supreme Court, the judgment of the Texas courts was upheld, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540. Justice Brewer, in delivering the opinion of the court, says:

"The single question in the case is whether, as between Texarkana and Goldthwaite, this was an interstate shipment. If so, the regulations of the state railroad commission do not control, and the court erred in enforcing the penalty. If, however, it was a purely local shipment, the judgment below was right and should be sustained. * * *

"The corn was carried from Texarkana, Tex., to Goldthwaite, Tex., upon a bill of lading which, upon its face, showed only a local transportation. It is, however, contended by the railway company that this local transportation was a continuation of a shipment from Hudson, S. D., to Texarkana, Tex.; that the place from which the corn started was Hudson, S. D., and the place at which the transportation ended was Goldthwaite, Tex.; that such transportation was interstate commerce, and that its interstate character was not affected by the various chang-

es of title or issues of bills of lading intermediate its departure from Hudson and its arrival at Goldthwaite.

"It is undoubtedly true that the character of a shipment, whether local or interstate, is not changed by a transfer of title during the transportation. But whether it be one or the other may depend on the contract of shipment. The rights and obligations of carriers and shippers are reciprocal. The first contract of shipment in this case was from Hudson to Texarkana. During that transportation a contract was made at Kansas City for the sale of the corn, but that did not affect the character of the shipment from Hudson to Texarkana. It was an interstate shipment after the contract of sale as well as before. In other words, the transportation which was contracted for, and which was not changed by any act of the parties, was transportation of the corn from Hudson to Texarkana; that is, an interstate shipment. The control over goods in process of transportation, which may be repeatedly changed by sales, is one thing, the transportation is another thing, and follows the contract of shipment, until that is changed by the agreement of owner and carrier. Neither the Harroun nor the Hardin Company changed or offered to change the contract of shipment, or the place of delivery. The Hardin Company accepted the contract of shipment theretofore made and purchased the corn to be delivered at Texarkana; that is, on the completion of the existing contract. When the Hardin Company accepted the corn at Texarkana the transportation contracted for ended. The carrier was under no obligation to carry it further. ·It transferred the corn, in obedience to the demands of the owner, to the Texas & Pacific Railway Company, to be delivered by it, under its contract with such owner. Whatever obligations may rest upon the carrier at the terminus of its transportation to deliver to some further carrier, in obedience to the instructions of the owner, it is acting, not as carrier, but simply as a forwarder. * * * Whatever may have been the thought or purpose of the Hardin Company in respect to the further disposition of the corn, was a matter immaterial so far as the completed transportation was concerned.

"In this respect there is no difference between an interstate passenger and an interstate transportation. If Hardin, for instance, had purchased at Hudson a ticket for interstate carriage to Texarkana, intending all the while after he reached Texarkana to go on to Goldthwaite, he would not be entitled, on his arrival at Texarkana, to a new ticket from Texarkana to Goldthwaite at the proportionate fraction of the rate prescribed by the Interstate Commerce Commission for carriage from Hudson to Goldthwaite."

The above decision was cited with approval by our state Supreme Court in the case of Texas & Pacific Ry. Co. v. Taylor, 103 Tex. 367, 126 S. W. 1117, 1200, in which it was held that where property was shipped by rail from one Texas station to another on the Mexican border, and there delivered to the shipper, the contract was intrastate, not international, and was governed by the Texas statute, although the shipper intended to, and did on receiving it, at this destination, reship over another line to a point in Mexico.

In Coley v. K. C. So. Ry., 43 Tex. Civ. App. 488, 95 S. W. 96, it was held that where a railroad engaged in putting down new rails on its road shipped rails from one state to another, and the cars in the shipments when they reached the latter point were held until the rails were needed as the work progressed, and then forwarded at different times and to different points along the road, said cars, after they left the first point of destination within the state, were not used in interstate traffic. In many respects the last-cited case is very similar to the one under consideration, and notably, in that the railway company was the consignor and the consignee both, making the shipment to its own order. It had the rails shipped from Colorado and consigned to it at Mena, Ark. When they reached the latter point, the cars were not unloaded, but were put in the yards and held there until the rails were needed as the work progressed, when, as before stated, the cars were forwarded at different times and to different points along the road.

In G., H. & S. A. Ry. v. Wood-Hagenbarth Cattle Co., 105 Tex. 178, 146 S. W. 538, the Supreme Court, in an opinion by present Chief Justice Phillips, illuminates this question by the use of the following language:

. "As to whether the movement of the cattle from Valentine to El Paso was an interstate or intrastate shipment must be determined by the following questions: What was the ultimate destination of the shipment at the time it was made? Though the ultimate destination may have been without the state, was there any break or interruption in the journey by any delivery of the cattle by the carrier to the consignee at El Paso?

"If at the time the shipment originated its final destination was without the state, and it moved to such destination in a continuous and uninterrupted journey, unaccompanied by any delivery by the carrier to the consignee within the state, it was clearly an interstate shipment under the well-established rules of this court upon this subject. On the other hand, if there was a delivery of the cattle by the carrier to the consignee within the state, it was an intrastate shipment, notwithstanding it may have been the intention of the shipper at the time the shipment was made that it should be transported to a point without the state as its ultimate destination."

By the test hereinabove given by the Supreme Court, we think that the shipment in the instant case is easily distinguishable from those in a number of cases cited by appellant, in which it was held that the shipments were interstate or international in character. For instance, in T. & N. O. Ry. v. Sabine Tram Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442, the United States Supreme Court held, in an opinion by Justice McKenna, that a shipment of lumber destined by the purchaser for export, made by the seller under a local bill of lading from an interior point in Texas to a Texas Gulf port, at which the lumber was unloaded without delay by the purchaser's order into slips or docks, in reach of ship's tackle, and was then loaded into chartered ships, by which it was carried to foreign ports—such shipment not being an isolated one, but typical of many others—constitutes foreign commerce. In this last-cited case, Justice McKenna cites G., C. & S. F. Ry. v. State of Texas, supra, and without in any way disturbing the holding in that case, distinguishes the Sabine Tram Co. Case from it, and further says:

"The facts in the case at bar are different. The lumber was ordered, manufactured and shipped for export. And we say 'shipped,' for we regard it of no consequence that the Sabine Company had no concern or connection with it after it reached Sabine. Its relation to the shipment was a perfectly natural one and did not change the relation of the Powell Company to it, and make the lumber other than lumber purchased at Ruliff, and started from there in transportation to a foreign destination. The findings are explicit and circumstantial as to this. And the shipment was not an isolated one but typical of many others, which constituted a commerce amounting in the year 1905 to 14,667,670 feet of lumber, and in the year 1906, 39,554,000 feet. Nor was there a break, in the sense of the interstate commerce law and the cited cases, in the continuity of the transportation of the lumber to foreign countries by the delay and its transhipment at Sabine."

[2] We do not think that because in the instant case the evidence does not disclose positively whether the coal was in the same cars at Ft. Worth as those in which it was shipped from Oklahoma points, or whether the cars had been unloaded and reloaded at Denison, can be in any way determinative of the issue involved. It is evident that there was no fixed destination in the mind of the shipper at the time of the shipment for these cars except Denison, but that the subsequent disposition and movement of the coal was to be determined after its arrival at Denison. Therefore we conclude that at the time of the injury plaintiff and defendant were not engaged in interstate commerce; and that in this respect the federal statutes have no controlling effect upon the plaintiff's cause of action, but that the same will be governed by the state statutes. Hence we overrule appellant's first, second, third, and fourth assignments, which, in various forms, present this contention.

[3] The special issue contained in defendant's requested charge No. 22, which was refused by the court and the refusal of which is assigned as error, reads:

"Did the plaintiff know, or must necessarily have known in the ordinary discharge of his duties, that said sand pipe was out of adjustment and in a defective condition, and of the danger incident to attempting to move said pipe with his foot, with such knowledge, while said engine was in motion?"

In its answer the defendant specially pleaded that:

"Defendant knew of the condition of said sand pipe, or by the exercise of ordinary care could have known it, and also knew of the damages incident to attempting to move the same, and yet with such knowledge he continued in the employment, and he attempted to move said sand pipe with his foot which he knew to be dangerous, and for that reason he assumed all the risks incident to such defective condition and of the manner in which he attempted to handle and move the same, and by reason of his said knowledge and assumption of the risk he is not entitled to recover against this defendant."

By article 6645, 4 Vernon's Sayles' Texas Civil Statutes, it is provided that the defense of assumed risk in a suit against a railway company for the death or personal injury of one of its employés, shall not be available in the following cases:

"First. Where such employé had an opportunity before being injured or killed to inform the employer, or a superior intrusted by the employer with the authority to remedy or cause to be remedied the defect, and does notify, or cause to be notified, the employer, or superior thereof, within a reasonable time: Provided, it shall not be necessary to give such information where the employer, or such superior thereof, already knows of the defect.

"Second. Where a person of ordinary care would have continued in the service with the knowledge of the defect and danger, and in such case it shall not be necessary that the servant or employé give notice of the defect as provided in subdivision 1 of this article."

Except as so limited by said statute, the common-law defense of assumed risk still obtains. It will be noted that in defendant's plea of assumed risk the exception contained in the second subdivision of the statute was expressly negatived. It thus appears that defendant not only tendered the issue whether or not the case came within the exception, but assumed the burden of showing that it did not. And in the special issue requested that question was omitted; neither has appellant cited any evidence to show that the case did not come within the statutory exceptions noted. In view of this condition of the record and as the judgment is to be reversed on another assignment, we deem it unnecessary to discuss the question of whether or not, in the absence of evidence showing that the case came within one or the other of the statutory exceptions noted, the assignment now under discussion should be sustained.

[4] In the opinion of the majority, what has been said with reference to the failure to submit special issue No. 22, is applicable to the objection urged to the refusal to give special charge No. 4, involving the question of assumed risk on the part of plaintiff in attempting to push the sand pipe back in line with his foot while the engine was in motion, and instructing the jury that if they found that plaintiff could easily have stopped his engine, and that if he had stopped it and had then attempted to adjust said sand pipe with his foot, the accident would not have occurred, they would find for the defendant. This charge, not including the special exceptions contained in article 6645 supra, did not give the plaintiff the benefit thereof.

The writer does not concur fully with the disposition of these two assignments, and were not the judgment of this court to be determined by other questions hereinafter to be discussed, he would feel impelled to embody in a dissenting opinion his views with reference thereto; but, as it is, he will content himself with this expression of his dissent from the views of the majority above expressed.

[5, 6] In the seventh assignment, complaint is made of the submission of special issue No. 8a, as follows:

"What sum of money, which if paid now, would be a reasonable, fair, and just compensation to him for mental and physical pain, if any, resulting and such as may result from the injuries received by him, if any, and also the reasonable value of his services for the time lost, by reason of his injury, up to this time, if any, and also for his diminished capacity to labor and earn money in the future, if any.

"In answering this question, should you, in response to the issue of contributory negligence, have found the plaintiff was guilty of contributory negligence, then you will take such contributory negligence into consideration in estimating said sum, and diminish the amount of the damages found by you in proportion to the amount of negligence which you attribute to the plaintiff, as compared to the combined negligence of both the plaintiff and the defendant. If you have found him not to have been guilty of contributory negligence, you will not diminish his damages in the amount you find as indicated above."

Defendant presented a special charge, which included the submission of the following issue:

"How much should plaintiff's damages be diminished as a result of his own contributory negligence?"

To the failure of the court to submit this charge and issue error is assigned under the eighth specification. We are of the opinion that the court should have submitted the issues so that the jury would have been instructed, either to find separately the amount of damages the plaintiff had sustained, and the amount to which they should be reduced because of plaintiff's contributory negligence, if they should find contributory negligence, or the proportion or relation which plaintiff's contributory negligence bore to the combined negligence of defendant and plaintiff. By this means only could the trial court, or can this court, determine the amount of damages that the jury believed the plaintiff had suffered, independent of the question of contributory negligence, and the proportionate relation that plaintiff's contributory negligence bore to the combined negligence of plaintiff and defendant.

Under the particular facts of this case, this court is entitled to know, as was the trial court, what was the basis of the finding of the jury as to the sum allowed plaintiff as damages, so that the question of the sufficiency or excessiveness thereof may be intelligently determined. From the verdict no one can tell what sum the jury found plaintiff would have been entitled to if no question of contributory negligence had been involved, nor how much such sum was reduced, if at all, by reason of the contributory negligence found. Neither can it be told what proportion of the combined negligence involved was held by the jury chargeable to the plaintiff. It is true every reasonable presumption should be entertained in support of the judgment rendered, and that a special verdict should be liberally construed so that it will stand, rather than fall. Dodd v. Gaines, 82 Tex. 429, 18 S. W. 618. But in this case, both by objection to the form of

184 S.W.—67

the issue as submitted, and by two special charges and issues requested, was the matter brought to the attention of the court.

[7] A special verdict must directly, fairly, and fully submit to the jury the material issues in the case, and should be sufficiently certain to stand as a final decision of the special matters with which it deals. Kirby v. P. & G. R. Co., 39 Tex. Civ. App. 252, 88 S. W. 281; Dunlap v. Canal & Mill Co., 43 Tex. Civ. App. 269, 95 S. W., 43; State v. Hanner, 143 N. C. 632, 57 S. E. 154, 24 L. R. A. (N. S.) 46.

[8] The difficulty that may be presented to a court, whether trial or appellate, in determining whether the verdict and the judgment thereon is excessive, confronts us here, because in one of its assignments the appellant charges the verdict and judgment is excessive. We are unable from the record to say whether the jury found large damages to plaintiff, say in the sum sued for, to wit, $50,000, and reduced it to the sum recited, $17,500, because of the great contributory negligence of plaintiff; or whether they found the sum to which plaintiff would have been entitled, irrespective of contributory negligence, was only slightly in excess of the special verdict rendered, say $18,000, but further found that plaintiff's negligence was slight as compared with defendant's, and therefore plaintiff's damages should be reduced only in a negligible manner.

We are of the opinion that the contention of appellant, as presented in the seventh, eighth, and ninth assignments, should be sustained. Darden v. Mathews, 22 Tex. 320; Mussina v. Shepherd, 44 Tex. 623; G., H. & S. A. Ry. v. Botts, 22 Tex. Civ. App. 609, 55 S. W. 514; Waco Cement Stone Works v. Smith, 162 S. W. 1158; Railway v. McClellan, 173 S. W. 258; Du Bose v. Battle, 34 S. W. 148.

Article 6649, Vernon's Sayles' Texas Civil Statutes, provides that in the event of contributory negligence in this kind of a case, "the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé." We have no way of determining whether this statutory requirement was complied with or not. The proportion that this contributory negligence bore to the combined negligence was one of the vital issues in the case, and in our opinion should have been submitted, when properly requested, in some succinct and definite form for a finding by the jury, and the failure to so submit it constitutes, as we think, reversible error.

[9] The questions presented in assignments 10 to 15, inclusive, attacking the findings of the jury (1) because the same, as claimed, are vague, obscure, etc., and (2) because the verdict is excessive, are disposed of by what we have said with reference to assignments 7 to 9 above. Nor do we find any error in the charge of the court, as urged in the sixteenth specification, to the effect that

it was the duty of defendant to exercise ordinary care to furnish plaintiff an ordinarily safe machine or engine with which to perform the services required of him, etc., as well as to exercise ordinary care to have the same inspected and repaired when out of repair. The contention is made that this charge authorized the jury to find acts of negligence on the part of the defendant not pleaded. Plaintiff's petition alleged that the engine was out of repair in respect to the condition of the sand pipe, and that defendant was guilty of negligence in permitting such condition to occur and continue, and in not having the engine inspected. This charge only purported to define the general duty of the defendant with reference to furnishing equipment and appliances. Later in the charge, the court restricted, by the submission of the special issues 1a and 2a, the right of recovery to the specific act of negligence charged. We do not think the holding in S. A. & A. P. Ry. v. Weigers, 22 Tex. Civ. App. 344, 54 S. W. 910, cited by appellant, is applicable to the question herein involved. In the cited case plaintiff relied on the alleged negligent act of defendant's foreman in attempting to bolt certain timbers overhead at the time plaintiff was engaged underneath in repairing a bridge; said foreman's acts being alleged to have caused the embankment to cave. It was evident from the pleadings that defendant's alleged negligence was not predicated upon a want of care in failing to furnish plaintiff a reasonably safe place in which to work. Hence the holding.

[10-12] We do not find any error in permitting plaintiff to testify that "from his experience and observation and knowledge of machinery, locomotive engines, etc., it was the custom and practice, when a sand pipe was out of line so as to throw the sand away from the rail, for an engineer to put his foot against it and push it around," as complained of in the seventeenth assignment. It is true that a defendant railroad, in order to avoid the charge of negligence, may not rely upon the fact that certain other railroads do not perform the duty, the violation of which is the subject of the complaint in plaintiff's petition, as held in Railway v. Evansich, 61 Tex. 3. Nor can a railway company be held guilty of negligence per se for failure to take certain precautions which certain other railways may observe, as announced in Railway v. Nelson, 20 Tex. Civ. App. 536, 49 S. W. 710. Yet in order to affect the degree of plaintiff's contributory negligence, if any, we think it was admissible to show that in performing the act of pushing the sand pipe with his foot, plaintiff was following the custom and practice of engineers generally. Railway v. Puente, 30 Tex. Civ. App. 246, 70 S. W. 362 (writ denied); Railway v. Hays, 40 Tex. Civ. App. 162, 89 S. W. 29; Railway v. Schilling, 32

Tex. Civ. App. 417, 75 S. W. 64. In Railway v. Puente, supra, Justice Neill says:

"Generally, the question of negligence is of such a character that it may be presumed that jurors are competent to decide the question, upon ascertaining the immediate facts, upon being informed as to the law by the court. But in cases where the question involved is of such a character that the jury will be aided by being advised of the practice of others under like circumstances, such evidence is competent, at least where the custom is a general or universal one" —citing Gillette Ind. & Col. Ev. § 128; Railway v. Reed, 88 Tex. 439, 31 S. W. 1058; Railway v. Nelson, 20 Tex. Civ. App. 536, 49 S. W. 710.

If the manner of remedying, or attempting to remedy, the defect followed by plaintiff was in accord with the usual custom of engineers under similar circumstances, as pleaded and testified to by plaintiff, such a custom might reasonably be presumed to have been acquiesced in, if not adopted, by railroads generally, including defendant, as held in the Hays Case, supra.

[13] Without further enlarging this opinion, already too long, we will content ourselves with stating that we do not find any error in permitting plaintiff to testify that he did not believe it was possible for a man to have loosened with his foot the sand pipe at the point where it was joined onto the cylinder. In so stating, he was testifying as an expert, with an experience with engines covering a period of more than 35 years.

For the errors mentioned above, it is the order and judgment of this court that the judgment of the trial court be reversed, and the cause remanded.